UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* GEORGE MANSOUR, M.D., | ) ) ) | Civil Action No. 8:19-cv-2977-T-36JSS |
| Plaintiff, | ) ) | |
| v. | ) ) | **FILED *EX PARTE* AND UNDER SEAL** |
| FREEDOM HEALTH, INC. and PHYSICIAN PARTNERS, LLC, | ) ) ) | **JURY TRIAL DEMAND** |
| Defendants. | ) ) ) | **DO NOT PLACE IN RUN BOX DO NOT PLACE ON PACER** |

---

### PLAINTIFF-RELATOR'S AMENDED QUI TAM COMPLAINT

---

Plaintiff-Relator George Mansour, M.D. brings this *qui tam* action pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.*, (the "FCA") in the name of and on behalf of the United States of America ("Plaintiff"), by and through his counsel of record, and states as follows:

### I.   INTRODUCTION

This is an action by *qui tam* relator George Mansour, M.D. ("Dr. Mansour") to recover penalties and damages arising from violations of the FCA committed by Defendants, Freedom Health, Inc. ("Freedom") and Physician Partners, LLC ("PPC").

From no later than February 2017 to the present, Defendants have implemented and executed an intentional and illegal practice of exerting consistent and intense pressure on affiliated physicians to fabricate and/or exaggerate diagnoses in patient medical records in

1

order to falsely inflate annual capitation payments from the Government under federal healthcare plans, including but not limited to Medicare Advantage plans.

More specifically, PPC, at the direction and approval of Freedom, has required physicians to utilize checklists during patient visits to ensure that previous patient diagnoses are "renewed" for each patient (regardless of their current applicability; has employed medical coders to review patient medical records after patient visits and to encourage physicians to add diagnoses or increase the reported complexity of diagnoses; has provided physicians lists of the diagnoses which result in the highest Government reimbursement levels and pressured physicians to "look for" these diagnoses during patient visits and add them to patient medical records; has identified "low payout" patients and pressured their treating physicians to add false or inaccurate diagnoses to these patients' records; and has conducted alleged "joint performance improvement" programs, during which PPC performs unnecessary diagnostic tests and then "suggests" new diagnoses for the patients' physicians to add to their medical records based on the test results.

PPC, at the direction and approval of Freedom, knowingly and intentionally coerces physicians to include diagnoses which either do not exist at all or are not present at the reported level of complexity in patient records. PPC, at the direction and approval of Freedom, ensures that its affiliated physicians engage in this fraudulent scheme by consistently and aggressively pressuring them to inflate or fabricate diagnoses, criticizing their "poor performance" when they do not do so, and eventually terminating their affiliation contracts with PPC (and thereby stripping them of their patients who are unable to continue

2

seeing them due to lack of coverage) if they object to or refuse to engage in this fraudulent scheme.

PPC's coercive practices, performed at the direction or approval of Freedom, have in fact resulted in the fabrication and/or exaggeration of diagnoses in federal health care patient medical records. Defendants' actions, as described above, constituted and/or resulted in the submission of false claims for payment to the Government. Defendants knowingly presented these false and fraudulent claims, including but not limited to claims for fraudulently inflated capitation payments under Medicare Advantage plans ("MA plans"), to the Government in order to obtain funds from the Government to which they were not entitled in violation of the FCA. If the Government had known the true nature of the Defendants' claims, it would not have reimbursed Defendants as requested. The Government received and paid these fraudulent claims, and Defendants knowingly accepted and retained the resulting improper payments.

Finally, when Dr. Mansour refused to engage in Defendants' fraudulent scheme, as described above, PPC, at the direction or approval of Freedom, terminated its contract with Dr. Mansour. As a result, Dr. Mansour's services were no longer covered by Defendants' MA plan, and Dr. Mansour's patients who were members of Defendants' MA plan were unable to receive treatment from Dr. Mansour. Defendants terminated Dr. Mansour's affiliation agreement in retaliation for his lawful efforts to prevent Defendants' fraud in violation of 31 U.S.C. § 3730(h).

## II.   PARTIES

1.      Plaintiff-Relator Dr. Mansour is a resident of Sarasota, Florida and has lived in the State of Florida since 1985.

2.      Dr. Mansour is a primary care physician and has been licensed to practice medicine in the State of Florida since 1997.

3.      Freedom is a corporation formed pursuant to the laws of the State of Florida. Its principal business office is located at 5600 Mariner Street, Suite 227, Tampa, Florida 33609.

4.      PPC is a corporation formed pursuant to the laws of the State of Florida. Its principal business office is located at 601 S. Harbour Island Boulevard, Tampa, Florida 33602.

5.      Dr. Mansour has personal knowledge of Defendants' fraudulent scheme to increase Medicare Advantage capitation payments through the inclusion of inaccurate diagnoses in the medical records of patients receiving treatment under Defendants' plans, as well as Defendants' submission of claims and receipt of Government funds related to the same. Defendants' actions, as described more fully below, resulted in false and fraudulent claims for healthcare services presented, or caused to be presented, to the Government by Defendants. Dr. Mansour therefore constitutes an original source, as defined in 31 U.S.C. § 3730(e)(4)(B), with respect to the claims described herein.

4

### III.   JURISDICTION AND VENUE

6.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), as well as 28 U.S.C. § 1345 (as the United States is a Plaintiff) and 31 U.S.C. §§ 3730(b) and 3732(a) (the FCA).

7.      The Court may exercise personal jurisdiction over both Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process in cases brought under the FCA in a judicial district in which any one defendant can be found, resides, transacts business, or in which any act proscribed by the FCA occurred. Defendants purposefully conduct business in this judicial district and, as alleged herein, various acts proscribed by the FCA occurred in this judicial district. Thus, personal jurisdiction over both Defendants lies with this Court.

8.      Venue is appropriate within the Middle District of Florida pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a) because: (i) a substantial part of the events and illegal acts and practices giving rise to the claims alleged in this Complaint occurred in this judicial district; (ii) Defendants purposefully conduct business in this judicial district; and (iii) as alleged herein, various acts proscribed by the FCA occurred in this judicial district.

9.      Dr. Mansour has made the appropriate and confidential voluntary disclosures to the United States Government prior to the filing of this lawsuit on behalf of Plaintiff as required by 31 U.S.C. § 3730(b)(2).

## IV.   SUMMARY OF APPLICABLE LAW

### A.   The False Claims Act

10.   Congress enacted the FCA which provides, in pertinent part, that any person

who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), . . . or (G); [or]

. . .

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than [$5,500 and not more than $22,363],[1] plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

11.   For purposes of this section, the terms "knowing" and "knowingly" mean that

a person, with respect to information, "(i) has actual knowledge of the information; (ii) acts

---

[1] Pursuant to 31 U.S.C. § 3729(a)(1), for each violation of the FCA, Plaintiff is entitled to recover a civil penalty "of not less than $5,500 and not more than $10,000, *as adjusted* by the Federal Civil Penalties Inflation Adjustment Act of 1990 (the "Inflation Act") . . ." (emphasis added). Per the relevant adjustments by the Inflation Act, Plaintiff is entitled to recover a civil penalty of $5,500 to $11,000 for each violation occurring from September 29, 1999, to November 2, 2015, and $11,181 to $22,363 for each violation occurring after November 2, 2015. *See* 28 C.F.R. § 85.3(a)(9) and 28 C.F.R. § 85.5, respectively. Thus, depending on the date upon which each individual violation occurred, Plaintiff is entitled to recover civil penalties ranging from $5,500 to $22,363 for each violation.

in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless

disregard of the truth or falsity of the information," and no proof of specific intent to defraud

is required. 31 U.S.C. § 3729(b)(1). The term "material" means "having a natural tendency to

influence, or be capable of influencing, the payment or receipt of money or property." 31

U.S.C. § 3729(b)(4).

12.     Additionally, § 3729(h) of the FCA provides, in pertinent part:

(1) In general.-- Any employee, contractor, or agent shall be entitled to all relief
necessary to make that employee, contractor, or agent whole, if that employee,
contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in
any other manner discriminated against in the terms and conditions of employment
because of lawful acts done by the employee, contractor, agent, or associated others
in furtherance of an action under this section or other efforts to stop 1 or more
violations of this subchapter.

(2) Relief.-- Relief under paragraph (1) shall include reinstatement with the same
seniority status that employee, contractor, or agent would have had but for the
discrimination, 2 times the amount of back pay, interest on the back pay, and
compensation for any special damages sustained as a result of the discrimination,
including litigation costs and reasonable attorneys' fees. An action under this
subsection may be brought in the appropriate district court of the United States for the
relief provided in this subsection.

**B.     The Medicare Advantage Program**

13.     Medicare is a federally-funded health care program primarily serving people

age 65 or older. Initially created in Title XVIII of the Social Security Act of 1965, Medicare

now has four Parts, A through D. The two original components of Medicare are Part A,

which covers inpatient hospital costs and related services, and Part B, which covers

outpatient health care costs, such as physicians' fees. Medicare Part D was created by the

Medicare Prescription Drug, Improvement, and Modernization Act established in 2003

("MMA") and covers prescription drugs. Medicare is funded by the federal government and administered by the Centers for Medicare & Medicaid Services ("CMS").

14.     Traditionally, Medicare operates on a fee-for-service basis, meaning that Medicare directly pays hospitals, physicians and other health care providers for each service they provide to a Medicare beneficiary. Medicare beneficiaries are generally required to pay some portion of many of these services in the form of copayments, deductibles, coinsurance, or other set fees (collectively known as the members "out of pocket" expenses).

15.     In 1997, Congress created Medicare Part C, which provides the same benefits to Medicare members, but does so based on a managed care model, rather than the traditional fee-for-service model. Under Part C, rather than pay providers directly, Medicare pays managed care plans (later named "Medicare Advantage" plans or "MA" plans) a fixed capitation rate (per member per month) and those plans are responsible for paying providers for the services they provide to members of that specific MA plan.

16.     MA plans must provide Medicare beneficiaries at least the same benefits they would have received under the traditional Medicare Parts A and B. Depending on the structure of the plan, MA plans may also provide additional benefits beyond what traditional Medicare would have covered, such as dental care, or cover some or all of their members' out of pocket expenses associated with basic Medicare Parts A and B services or Part D prescription drugs.

### 1.     Calculation of MA plan Capitation Rates

17.     The capitation rates Medicare pays to MA plans are determined based on a process involving consideration of past and expected future medical expenses, the location of

the plan's actual and expected members, the health status of those members, and whether the plan will include any additional benefits. That process is summarized in Medicare regulations as follows:

> In short, under the bidding methodology each plan's bid for coverage of Part A and Part B benefits (*i.e.*, its revenue requirements for offering original Medicare benefits) is compared to the plan benchmark (*i.e.*, the upper limit of CMS' payment, developed from the county capitation rates in the local plan's service area or from the MA regional benchmarks for regional plans). The purpose of the bid benchmark comparison is to determine whether the plan must offer supplemental benefits or must charge a basic beneficiary premium for NB benefits.

Medicare Managed Care Manual ("MMCM"), Ch. 8, § 60.

18.     In other words, it is a three-step process involving: (a) development of the MA plan's bid rate; (b) review of the CMS benchmark rate; and (c) comparison of those two rates to develop the base capitation rate and determine whether any adjustments in the plan benefits or member premiums are required.

19.     First, the MA plan develops a bid rate. This rate is the amount that the MA plan expects it will be required to pay to provide Medicare Parts A and B benefits to a hypothetical average member of the plan. This estimate must be based on either the MA plan's prior experience covering Medicare members, or on actuarially validated data analysis of expected costs. To represent an "average" plan member, the bid rate must make adjustments to standardize the effect of expected geographic diversity (because some areas are more expensive than others) and the relative health status (i.e., the number and nature of chronic health conditions) of the members whose claims experience provided the basis for

the bid. The bid rate also includes an amount that the MA plan expects to spend on administrative costs, and a profit margin.

20.     The mechanism for standardizing the bids by geographic area is known as the ISAR (Intra-Service Area Rate) Factor. Medicare has determined that providing services to its members in certain counties tends to cost more than providing such services to members in other counties-either because the care is more expensive or because more care is required. Medicare has established tables which can be used to determine how expensive care is in one county versus another. When developing their bid rate, MA plans must use these tables to develop a rate that would be required to provide care to a hypothetical member in a county where care for Medicare members costs an "average" amount.

21.     The mechanism for standardizing the bid for individuals' health status is known as the "risk score" or CMS-Hierarchical Condition Category ("CMS-HCC"). It is an artificial score that CMS assigns to every beneficiary. CMS starts with a score of zero, and then adds points for the beneficiary's demographic condition (such as age and gender) and individual disease states (such as diabetes or heart failure). The average CMS-HCC score is one, with most Medicare beneficiaries having scores under three. The system is set so that someone with a risk score of two would be expected to need twice as much health care (in dollars) as someone with a score of one. The bid rate the MA plans develop must reflect the amount they will require to provide services to a hypothetical member with a risk score of one.

22.     Second, the MA plan must review the Medicare benchmark rate provided by CMS. This rate is provided by CMS and is the amount that the Medicare program would

spend to provide Parts A and B benefits to an average member in the geographic area covered by the MA plan's bid. This benchmark rate is based on the amount Medicare would pay for a member of standard health status (*i.e.*, a risk factor of one). The benchmark rate also includes several other adjustments, including a bonus payment to incentivize health insurance companies to enter the MA market.

23.     Third, the bid rate and the benchmark rate are compared to determine whether the MA plan must charge its members a premium or, instead, if it must offer them enhanced benefits. If the bid rate is greater than the benchmark rate, Medicare will only pay the MA plan the benchmark rate per member per month. That benchmark rate becomes the base capitation rate. The MA plan must then charge the beneficiaries who join its plan a monthly premium in order to make up the shortfall between the bid rate and the base capitation rate. *See* MMCM, Ch. 8, § 60.1.

24.     If, on the other hand, the bid rate is less than the benchmark rate, then the bid rate becomes the starting point for the calculation of the base capitation rate. The difference between the benchmark rate and the bid rate is then split between the plan members and the Medicare program. The first 25% of the difference is retained by the Medicare program as plan savings. The remaining 75% is returned to the MA plan, which must use the rebate to either provide enhanced benefits to its plan members or to cover the members' out of pocket expenses. In the end, then, in such situations, the base capitation rate equals the bid rate plus 75% of the difference between the bid rate and the benchmark rate.

25.     Medicare does not, however, pay the plans exactly the base capitation rate. Instead, when payments are actually made, the base capitation rate is adjusted, for each

11

member, to reflect his or her geographic ISAR score (based on the county where they live) and risk adjustment score (based on their health status).

26.     Consequently, MA plans whose members live in relatively expensive counties will receive a higher actual capitation rate than another plan, even if both plans had the same base capitation rate. So too, MA plans with a high percentage of members with high risk factors (or more complex medical diagnoses) will have a higher actual capitation rate than MA plans with healthier, lower-risk members, even if their base capitation rate is the same.

27.     MA plans must rebid their rates every year.

### 2.     Risk Adjustment Scores, which Affect Capitation Payments, Depend on Accurate, Substantiated Heath Condition Codes.

28.     As described above, CMS pays MA plans at a capitation rate that is influenced by, among other things, each member's health status. The process of adjusting the capitation rate to reflect a member's disease states (and predicted claims expense) is known as risk adjustment. Risk adjustment is intended to improve the accuracy of the payments CMS makes to MA plans. To this end, CMS pays a higher future premium for enrollees who required treatment for expensive diseases and conditions in the current year, based on the expectation that the enrollee will require similarly expensive treatment in following years. Conversely, CMS pays a lower premium for enrollees who, although they may have certain typically expensive conditions, did not require treatment for those conditions in the current year. For these patients, the risk adjustment methodology assumes that because their condition did not require treatment in the current year, it has improved or otherwise changed so that it is not expected to require treatment in the following year.

29.     Obviously, such a system depends on access to as much accurate data as is available about the health status of the enrollees. The risk adjustment model will not work if MA plans do not truthfully and accurately report the health conditions of their members to CMS.

30.     As a practical matter, the CMS risk adjustment model evaluates enrollee health (**and bases risk adjustment payment rates**) using diagnosis classifications set forth in the International Classification of Diseases, 10th Edition, Clinical Modification ("ICD-10-CM") system. The ICD-10 system assigns each diagnosis a specific code. These individual diagnosis codes are then organized into groups, called Hierarchical Condition Categories ("HCCs"). MMCM, Ch. 8, § 50. Every HCC consists of several ICD-10-CM diagnosis codes that are clinically related and are expected to require a similar level of resources to treat. *Id.* For example, there are five HCCs for patients with diabetes: HCC 15 (Diabetes with Renal or Peripheral Circulatory Manifestation); HCC 16 (Diabetes with Neurologic or Other Specified Manifestation); HCC 17 (Diabetes with Acute Complication); HCC 18 (Diabetes with Ophthalmologic or Unspecified Manifestation); and HCC 19 (Diabetes without Complication). Generally speaking, patients grouped in HCC 15 have the most serious type of diabetes and are expected to cost the most to treat. Patients in HCC 19 have the least cost-intensive type of diabetes, and therefore the CMS risk adjustment system provides a smaller enhanced payment for these patients.

31.     The CMS-HCC model converts the diagnosis codes the MA plan submits for each member into a Medicare Risk Adjustment score commonly called an "MRA" score. When a MA plan inputs a member's diagnoses into the model, the model outputs an MRA

score "that reflects the beneficiary demographic characteristics and combination of HCCs associated with the beneficiary for the data collection year." MMCM, Ch. 8, § 50. The CMS-HCC system normalizes the average CMS beneficiary to an MRA score of one; members diagnosed with multiple serious chronic conditions may have an MRA score as high as eight or more.

32.     CMS uses the member's MRA score to adjust the MA plan's base payment rate for member health status, which is the first step in determining the monthly per capita payment rate for the member. MMCM, Ch. 8, § 50. The MA plan multiplies its base capitation rate by the member's MRA score. Next, the MA plan multiplies the adjusted rate by the member's geographic ISAR score. MMCM, Ch. 8, § 60.3. The ISAR score accounts for cost differences among the counties in the plan's service area, as well as the plan's relative enrollment distribution among those counties. *Id.* **Adjusting the base capitation rate by the member's MRA score and ISAR score determines the member's monthly capitation rate**.

33.     An individual ICD-10-CM code included in the HCC system corresponds on average to over $2,000 in extra revenue for the plan over the course of the following year.

34.     Because submitting incorrect diagnosis codes increases risk adjustment payments, CMS requires MA plans to follow strict guidelines when submitting codes. *See, e.g.,* 2008 Risk Adjustment Training for Medicare Advantage Organizations Participant Guide ("Participant Guide"). First, CMS requires that the patient **must have been treated** for the relevant diagnoses during a face-to-face encounter with a physician or a hospital during the year in question. *See* MMCM, Ch. 7, § 40 (All diagnosis codes must be documented "as a

14

result of a face-to-face visit."), § 120 (requiring that diagnoses codes are used to describe "the clinical reason for a patient's *treatment*" and that they be reported along with the dates of served during which the "beneficiary *received medical treatment*") (emphasis added). The treating provider must document the facts supporting the coded diagnosis in the patient's medical record and sign and date the record.

35.     Only services provided by a treating physician, or by a hospital in an inpatient or outpatient setting may be included. CMS expressly prohibits MA plans from submitting "risk adjustment diagnoses based on any diagnostic radiology services." *Participant Guide*, at 4-3. The reason CMS prohibits MA plans from submitting codes based on radiology charts, including but not limited to ultrasounds, is that "[d]iagnostic radiologists typically do not document confirmed diagnoses. Confirmed diagnoses come from referring physician or physician extenders." *Id*. In other words, radiology services are not a valid provider type.

36.     MA plans are responsible for the content of risk adjustment data submissions to CMS. CMS rules provide that MA plans are responsible for the accuracy of the data they submit to CMS. *Id*. at 3-13.

37.     MA plans are also required to correct the risk adjustment data they submit to CMS. If the MA plan learns that information in a submitted diagnosis contains an error, it must submit a "delete record" to CMS for that diagnosis. The MA plan may then submit corrected data. *Id*. at 4-13.

### 3.     CMS Requires MA plans to Certify the Validity of Their Bid Rates and Risk Adjustment Data To Prevent Fraud.

38.     In recognition of the fact that the integrity of the capitation rates depends on the integrity of the actuarial information used by the MA plans in developing their bid rates,

and to otherwise guard against fraud, CMS requires MA organizations to submit three separate attestations, each signed by the CEO or CFO (or their authorized, direct subordinate). These attestations are a condition that the MA plans must meet to be eligible to receive any capitation payments from CMS.

39.     The first attestation, which the MA organization submits on a monthly basis, requires the MA organization to "attest based on best knowledge, information, and belief that each enrollee for whom the MA Organization is requesting payment is validly enrolled, or was validly enrolled during the period for which payment is requested, in an MA plan offered by the MA Organization."

40.     The second attestation, which is submitted annually, requires the MA organization to attest that the risk adjustment data it submits annually to CMS is "accurate, complete, and truthful." The attestation acknowledges that risk adjustment information "directly affects the calculation of CMS payments . . . and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution."

41.     The third attestation is the MA organization's certification "that the information and documentation comprising the bid submission proposal is accurate, complete, and truthful and fully conforms to the Bid Form and Plan Benefit Package requirements; and that the benefits described in the CMS-approved proposal bid submission agree with the benefit package the MA Organization will offer during the period covered by the proposal bid submission."

## V.     DEFENDANTS' MEDICARE ADVANTAGE PLANS

42.     Freedom is a health maintenance organization ("HMO") which provides managed care plans, including MA plans, to patient enrollees throughout the State of Florida. Upon information and belief, Freedom operates in thirty counties throughout Florida pursuant to a certificate of authority from the Florida Office of Insurance Regulation and the approval of CMS.

43.     Freedom affiliates and contracts with PPC, an independent practice association ("IPA"), to manage the provision of health services under Freedom's MA plans by a group of approximately 300 affiliated physicians.

44.     Strict rules govern the management of MA plans to ensure both that the Medicare beneficiaries receive the healthcare they need and that the Government does not overpay for these services. Defendants have consistently and deliberately violated those program rules in order to fraudulently increase their profits.

## VI.    DEFENDANTS' FRAUDULENT SCHEME TO FABRICATE DIAGNOSES

45.     On February 6, 2017, Dr. Mansour entered into a Physician Affiliate Agreement with PPC (the "Agreement"). Dr. Mansour treated patients covered by Defendants' MA plan as an affiliated primary care physician pursuant to the Agreement from February 6, 2017, until May 31, 2019, when PPC illegally terminated the Agreement.

46.     Throughout his affiliation with PPC, Dr. Mansour communicated frequently with representatives of PPC and Freedom regarding the provision of healthcare services to and the determination of diagnoses of MA plan patients under Defendants' MA plan.

47.     Beginning no later than February 2017 and, upon information and belief, up to the present, in violation of Medicare regulations and the FCA, Defendants have knowingly

engaged in a fraudulent scheme to fabricate and/or exaggerate the complexity of MA plan patient diagnoses, by threatening, inducing, and coercing these patients' treating physicians, including but not limited to Dr. Mansour, to include inaccurate diagnoses in patient medical records, in order to fraudulently increase capitation payments from the Government to Defendants.

48.     In violation of the FCA, Defendants have requested, received, and retained fraudulently increased capitation payments from the Government for the treatment of MA plan patients with upcoded and inaccurately reported diagnoses.

### A.     Utilization of 5 Star Checklists

49.     Dr. Mansour personally observed that Defendants create and provide to affiliated physicians (including himself) via their patient portal a "5 Star Checklist" for each individual patient before the patient's office visit with his or her treating physician. These 5 Star Checklists state all diseases and illnesses that are currently diagnosed for the patient, as well as the patient's previous diseases and illnesses and additional diseases and illnesses which Defendants "suspect" the patient may have.

50.     Defendants' 5 Star Checklists also report the percentage of diagnoses that are currently "missing" from the patient's medical records, the patient's current MRA score, and the patient's potential or goal MRA score (*i.e.*, the MRA score the patient would have if all previous and suspected diagnoses were renewed or added).

51.     The 5 Star Checklists also contain an instruction that the checklists should not be included in patient medical records. **When a Freedom representative visited Dr. Mansour's office in or around September 2018 to conduct an audit of his records, she**

18

**explicitly instructed Dr. Mansour that 5 Star Checklists should not be included in patient charts or records because they are "steering tools."**

52.    Defendants instruct affiliated physicians, including but not limited to Dr. Mansour, to review the corresponding 5 Star Checklist during each patient visit in order to ensure that no potential diagnoses or past diagnoses are "missed." Defendants encourage affiliated physicians to capture as many new diagnoses as possible and renew as many past diagnoses as possible. Defendants require affiliated physicians to certify on the 5 Star Checklist that they have evaluated the patient for each suggested diagnosis and to indicate which suggested diagnoses they are adding.

53.    During Dr. Mansour's affiliation with Defendants, a PPC representative came to Dr. Mansour's office twice a week to scan Dr. Mansour's completed 5 Star Checklists and send them to PPC so that PPC could revise them for the next visit (to reflect which diagnoses were captured and which were still "missing"), and so that, as described further below, PPC's medical coders could review Dr. Mansour's conclusions and suggest revisions.

54.    When Dr. Mansour indicated that suggested diagnoses were not present and had never been present for a patient, they would nevertheless reappear as suggested diagnoses for the same patient in the 5 Star Checklist for the patient's next visit, despite Dr. Mansour's medical opinion and conclusion.

55.    Dr. Mansour personally observed that numerous 5 Star Checklists reported that certain diagnoses, *e.g.*, disorder of the parathyroid gland or hyperparathyroidism (collectively, "HPT") and homocystinuria ("HCN"), were either present in the patient's past history or were previously reported as present by the patients' primary care physician or

19

another physician. However, Dr. Mansour confirmed that these diagnoses were not in fact present in the patient's previous medical records and that neither the patients' primary care physician (Dr. Mansour himself) nor any of the patients' other physicians, had ever diagnosed these conditions. Dr. Mansour reported this to Defendants.

56.     For example, the following diagnoses appeared in 5 Star Checklists and were not present in the corresponding patient's past history or diagnosed by the patient's physicians:

| Patient | Visit Date | False Diagnosis | False Diagnosis Year | Alleged Diagnosis Source |
|---------|------------|-----------------|----------------------|--------------------------|
| Pt. No. 1 | 7/2/18 | HPT | 2015 | Past History |
| Pt. No. 2 | 10/23/18 | HPT | 2015 | Past History |
| Pt. No. 3 | 7/24/18 | HCN | 2016 | Past History |
| Pt. No. 4 | 5/11/18 | HPT | 2015 | Past History |
| Pt. No. 5 | 4/20/18 | HPT | 2015 | Past History |
| Pt. No. 6 | 6/1/18 | HPT | 2015 | Past History |
| Pt. No. 7 | 5/31/18 | HPT | 2015 | Past History |
| Pt. No. 8 | 6/18/18 | HPT | 2015 | Past History |
| Pt. No. 9 | 7/16/18 | HPT | 2015 | Past History |
| Pt. No. 10 | 7/26/18 | HPT | 2015 | Past History |
| Pt. No. 11 | 4/27/18 | HPT | 2015 | Past History |
| Pt. No. 12 | 7/26/18 | HCN | 2016 | Past History |
| Pt. No. 13 | 7/29/18 | HPT | 2015 | Past History |
| Pt. No. 14 | 12/7/18 | HPT | 2015 | Past History |
| Pt. No. 15 | 7/10/18 | HPT | 2015 | Past History |
| Pt. No. 16 | 7/20/18 | HPT | 2015 | Past History |
| Pt. No. 17 | 7/2/18 | HCN | 2016 | Past History |
| Pt. No. 18 | 7/27/18 | HCN | 2016 | Dr. Mansour |
| Pt. No. 19 | 7/10/18 | HPT | 2015 | Past History |
| Pt. No. 20 | 6/11/18 | HCN | 2016 | Dr. Mansour |

57.     When Dr. Mansour discussed this issue with a representative of Freedom's previous IPA, Trinity, the representative informed Dr. Mansour that in 2015 and/or 2016, Trinity inaccurately reported a diagnosis of homocystinuria (HCN) (a rare and highly

reimbursed disease) for hundreds of patients who only had homocysteinemia (a common disorder resulting in minimal reimbursement). The representative confirmed that Freedom discovered this error, but did not report it to the Government, and retained the resulting overpayments in the form of increased capitation payments for the corresponding patients. Trinity's representative also reported that Freedom maintained a fund of $1.5 million for some time in case Medicare conducted an audit and demanded that the overpayment be returned.

58.     Additionally, a representative of Defendants explained that during the same time frame, likely due to a computer glitch, Freedom inaccurately reported a diagnosis of hyperparathyroidism (HPT) for hundreds of patients who did not have this illness. Upon information and belief, upon discovering this error, Freedom did not report it to the Government, and instead retained the resulting overpayments in the form of increased capitation payments for the corresponding patients.

59.     Dr. Mansour also observed that many other diagnoses, which his patients had never had, were falsely attributed to his patients in 5 Star Checklists. For example, Defendants' 5 Star Checklists incorrectly reported that the following patients suffered from the illnesses listed below:

| Patient | Visit Date | False Diagnosis | False Diagnosis Year | False Diagnosis Source |
|---------|-----------|-----------------|---------------------|------------------------|
| Pt. No. 21 | 6/19/18 | Chronic Kidney Disease | 2015 | Past History |
| Pt. No. 22 | 7/12/18 | Heart & Kidney Disease | 2017, 2016 | Past History |
| Pt. No. 23 | 4/9/18 | Multiple Sclerosis | 2015 | Hospital |

| Pt. No. 23 | 4/9/18 | Malignant Neoplasm | 2015 | Past History |
| Pt. No. 10 | 7/26/18 | Diabetes Mellitus | 2015 | Past History |
| Pt. No. 16 | 7/20/18 | Diabetes Mellitus | 2015 | Past History |

60.     Defendants also often suggested diagnoses on the 5 Star Checklist based solely on past histories, rather than any patient symptoms or clinical indications. By doing so, Defendants effectively suggested ways in which physicians could upcode existing diagnoses to more complicated (and profitable) diagnoses or add new diagnoses for asymptomatic patients. For example, the following diagnoses were suggested based solely on the alleged sources listed below:

| Patient | Visit Date | Suggested Diagnosis | Suggested Diagnosis Source |
|---|---|---|---|
| Pt. No. 24 | 3/11/19 | Alcoholic Polyneuropathy | Alcohol Dependence |
| Pt. No. 24 | 3/11/19 | Chronic Obstructive Pulmonary Disease | History of Smoking |
| Pt. No. 8 | 6/18/18 | Protein Calorie Malnutrition | Past Cancer Diagnosis |
| Pt. No. 25 | 7/17/18 | Protein Calorie Malnutrition | Past Cancer Diagnosis |

61.     Additionally, when patients were scheduled for office visits with Dr. Mansour and Defendants did not have a previous or suspected diagnosis to report, Defendants generated and provided to Dr. Mansour a "Common Conditions Checklist." This Checklist listed "common diseases that are highly prevalent in the senior population," such as senile purpura (ICD-10 Code D69.2), type 2 diabetes mellitus with hyperglycemia (ICD-10 Code E11.65), morbid obesity (ICD-10 Code E66.01), chronic obstructive pulmonary disease (ICD-10 Code J44.1), peripheral vascular disease (ICD-10 Code I73.9), major depressive disorder (ICD-10 Code F33.0), protein calorie malnutrition (ICD-10 Code E44.1),

hemiplegia (ICD-10 Code I69.959), opioid dependency (ICD-10 Code F11.20), and alcohol dependency (ICD-10 Code F10.20). These checklists instructed Dr. Mansour to look for these particular diagnoses during his examination of the patient.

62.     For example, Dr. Mansour was provided a Common Conditions Checklist and instructed to look for all listed conditions (none of which were clinically indicated or actually present) during the following patient examinations: Pt. No. 26 (12/27/18), Pt. No. 27 (12/17/18), and Pt. No. 28 (7/26/18).

63.     When Dr. Mansour included an affirmative statements in his progress notes that he had checked for these common conditions and that none of them were present, **he was instructed by Defendants' medical coder that this information should not be included in the patients' medical records**, and that he should only mention the listed common conditions if they were in fact present. Defendants wanted to hide the pressure they were exerting on Dr. Mansour.

64.     Defendants utilized the 5 Star Checklists to pressure physicians to add false or exaggerated diagnoses to patient records, even when the suggested diagnoses were not clinically indicated and/or were based on past diagnoses that never actually occurred. Defendants also attempted to conceal their fraudulent practices by excluding them from patient medical records.

**B.     Audits of Patient Medical Records by Defendants' Medical Coders**

65.     Dr. Mansour personally observed that Defendants employ or contract medical coders to "audit" affiliated physician medical records after patient visits are completed.

66.     Though these medical coders are not physicians, they are hired by Defendants to "audit" the medical records from patient visits conducted by affiliated physicians. The medical coders review the 5 Star Checklists and past patient medical records, compare them to the medical records generated by the affiliated physician for a patient visit, and "suggest" additional diagnoses that the affiliated physician should include.

67.     The medical coders send their audit results to the affiliated physician and **direct the affiliated physician to revise the patient medical record accordingly within thirty days of the visit** (*i.e.*, before the patient visit record must be finalized).

68.     The medical coder assigned to Dr. Mansour initially contacted Dr. Mansour by phone to "guide" him regarding diagnosis coding. This call took place in August 2018 and lasted approximately two hours. Defendants paid Dr. Mansour $200 per hour to consult with the medical coder by phone regarding diagnosis coding. After this call, Dr. Mansour requested that the medical coder contact him in writing rather than by phone, as he felt that the payment for telephonic consultations was designed to induce him to change diagnoses in accordance with the medical coder's recommendations (which it was).

69.     The medical coder contacted Dr. Mansour weekly regarding changes and suggested diagnoses to add to Dr. Mansour's patient records. For example, if a patient previously suffered from angina, but no longer had angina, Dr. Mansour would remove this diagnosis completely, but the medical coder would then instruct Dr. Mansour to state "Angina- Under Control with Medicine" instead so that the diagnosis would remain on the patient's record. Similarly, if a patient previously suffered from alcohol dependence, but had since recovered, Dr. Mansour would remove this diagnosis completely, but the medical coder

would then instruct Dr. Mansour to state "Alcohol Dependence- In Remission" instead so that the diagnosis would remain on the patient's record and Defendants could continue to receive increased capitation payments as a result.

70.     Dr. Mansour frequently argued with the medical coder regarding inappropriate suggested diagnoses for which the patients required no treatment; however, he sometimes succumbed to the medical coder's intense, weekly pressure to include inaccurate diagnoses, in which case Dr. Mansour would revise and re-dictate his patient visit records to include the false or exaggerated diagnoses suggested by the medical coder.

## C.     Tracking and Encouraging Utilization of High Reimbursement Diagnoses

71.     Dr. Mansour personally observed that Defendants send affiliated physicians diagnosis spreadsheets (as well as posters of the same to hang on their walls) which identify only high reimbursement diagnoses. These spreadsheets list the high reimbursement diagnoses along with their corresponding MRA scores in order to steer physicians toward the high payout diagnoses which would result in the greatest increase in capitation payments. Defendants then encourage affiliated physicians to "look for" and "capture" these particular high-MRA score diagnoses.

72.     Defendants also conduct "bootcamps" approximately every four months to "train" affiliated physicians on diagnosis coding. Though these bootcamps are marketed as opportunities for affiliated physicians to stay updated regarding changes to Medicare regulations and diagnosis codes, they consisted primarily of teaching the affiliated physicians which diagnoses to report in order to obtain higher capitation reimbursements. Defendants

encouraged the affiliated physicians, their physician assistants, and any other staff members who code diagnoses to attend all bootcamp trainings.

**D.    Targeting Low MRA Score Patients**

73.    Defendants prepared Member Expense Reports for Dr. Mansour, and these reports were delivered to Dr. Mansour by a PPC representative in person approximately once a month. The reports stated, for each of Dr. Mansour's MA plan patients who cost the plan above a certain dollar amount per year, the patient's name, MRA score, and total plan expenses for his or her treatment.

74.    Defendants identified the patients with lower MRA scores in these reports and pressured Dr. Mansour to bring the patients in for office visits, "figure out why" their MRA scores were low and add or renew diagnoses to increase their MRA scores (and, consequently, increase Defendants' capitation payments).

**E.    Implementation of "Joint Performance Improvement" Programs**

75.    Dr. Mansour personally observed that Defendants implement "joint performance improvement" programs, in which they conduct unnecessary diagnostic testing and office visits for MA plan patients in order to add or renew diagnoses and increase these patients' MRA scores.

76.    Defendants consistently report a much higher frequency of suggested diagnoses as a result of joint improvement programs than would be normal for a similar patient population.

77.    Based on Dr. Mansour's personal knowledge regarding healthcare costs and capitation rates, the cost to Defendants to provide unnecessary testing and/or office visits is

dwarfed by the increase in capitation payments Defendants achieve from the additional "suggested" diagnoses which are captured as a result.

### 1.   21 Patient Ultrasound Sample

78.     In 2018, Defendants requested that Dr. Mansour participate in a "joint performance improvement program" which simply involved conducting ultrasounds on a sample of Dr. Mansour's MA plan patients in Dr. Mansour's office free of charge. Defendants led Dr. Mansour to believe that the purpose of this program was to improve patient health, but this was false.

79.     Dr. Mansour suggested that he select a group of high-risk patients who had never had ultrasounds to receive the free ultrasounds. Defendants stated that they would instead select the patients who would receive free ultrasounds. Instead of selecting high-risk patients, Defendants selected MA plan patients who had low MRA scores (and thus, low capitation payments).

80.     Dr. Mansour suggested that he provide technicians to conduct the ultrasounds and specialists to interpret the ultrasounds. Defendants stated that they would provide their own staff to conduct and interpret the ultrasounds.

81.     The physician provided by PPC to interpret the ultrasound results was a radiologist. He was not a vascular specialist or cardiologist, and was therefore not qualified to provide clinical diagnoses, such as atherosclerosis, peripheral vascular disease ("PVD"), pulmonary hypertension ("PHT), diastolic dysfunction ("DD"), diastolic congestive heart failure ("DCHF"), or systolic congestive heart failure ("SCHF"). Additionally, the radiologist's suggested diagnoses were not based on any clinical information for the patient

(*i.e.*, family or medical history, physical examination, or necessary treatment etc.), but, rather, solely the ultrasound image.

82.     Under this joint performance improvement plan, Dr. Mansour was to conduct a separate office visit with each patient to record new diagnoses for the patients based on the findings of the PPC physician (thereby fraudulently covering up that the diagnoses were actually made by a non-treating radiologist based solely on ultrasound results).

83.     Defendants agreed to pay Dr. Mansour $400 per day in which ultrasounds were conducted at his office, as well as $20 for each patient which Dr. Mansour subsequently saw for an in-office follow up visit. These incentive payments were designed to encourage affiliated physicians, including Dr. Mansour, to participate in Defendants' scheme of making suggested diagnoses, which were fabricated by Defendants' non-treating radiologist based on ultrasound results, appear to be the diagnoses of the patients' treating physicians.

84.     In April 2018, twenty-one sample patients selected by Defendants came to Dr. Mansour's office, where an ultrasound technician provided by PPC conducted ultrasounds at no cost to the patient. The radiologist provided by PPC then interpreted the ultrasounds and provided his findings, including his suggested diagnoses, to Dr. Mansour.

85.     After their ultrasounds were complete, Dr. Mansour brought each of the sample patients back to his office for a follow up visit. Dr. Mansour personally observed that Defendants' radiologist suggested a diagnosis of atherosclerosis or PVD (peripheral vascular disease) for twenty of the twenty-one sample patients (approximately 95%), while the national average for patients in the corresponding demographic is approximately 10% or less.

86.     Defendants' radiologist also suggested a diagnosis of PHT (pulmonary hypertension) for eight of the sample patients, none of whom had any symptoms of PHT or required any treatment for PHT. Additionally, Dr. Mansour observed that Defendants' radiologist suggested a diagnosis of DCHF (diastolic congestive heart failure) or SCHF (systolic congestive heart failure) for six sample patients; however, these six patients either suffered from no cardiac condition at all or only suffered from the less complicated (and less profitable) diagnoses of DD (diastolic dysfunction).

87.     Dr. Mansour personally observed that the vast majority of Defendants' suggested diagnoses were inaccurate (*i.e.*, Defendants suggested adding atherosclerosis, PVD, PHT, DCHF, or SCHF diagnoses for many patients who should not have been diagnosed with these diseases based on their test results, did not require any treatment for these diseases, and were entirely asymptomatic).

88.     Dr. Mansour reported new diagnoses for a few of the sample patients, if clinically indicated, but he concluded that most of the patients did not actually have any of the new diagnoses that Defendants' radiologist suggested, and that for those patients, the diagnoses suggested by Defendants were incorrect and should not be reported. As such, Dr. Mansour initially did not report these false suggested diagnoses.

89.     Defendants' medical coder then contacted Dr. Mansour and urged him to revise his exam notes to include the diagnoses originally suggested by Defendants and their radiologist. For example, Dr. Mansour told Defendants' medical coder that certain patients should only be diagnosed with DD and that they did not have the more complex and more highly reimbursed diagnoses of DCHF or SCHF. The medical coder, however, told Dr.

Mansour that he needed to report a diagnosis of DCHF or SCHF because these diagnoses, unlike DD, were payable (*i.e.*, Defendants would only receive additional capitation payments if DCHF or SCHF was diagnosed instead of DD).

90. Dr. Mansour continued resisting including inaccurate diagnoses until Defendants' upper management became involved, at which point he succumbed to their pressure, and reported atherosclerosis, PVD, PHT, DCHF, and/or SCHF diagnoses for each and every patient Defendants instructed (*i.e.*, for eighteen of the twenty-one patients).

91. In Dr. Mansour's exam notes reporting these inaccurate diagnoses, he often stated that these particular diagnoses were asymptomatic (to indicate that they didn't require any treatment) or "based on ultrasound diagnosis" (to indicate that they were not based on his medical judgment, but rather on the false diagnoses suggested by Defendants' radiologist based solely on ultrasound results).

92. As a result of Defendants' intense, continuous pressure, Dr. Mansour reported the following diagnoses, which were suggested by Defendants' radiologist based solely on ultrasound results, not clinically indicated, did not require treatment, and were false:

| Patient | Visit Date | Diagnoses Reported by Dr. Mansour due to Pressure from Defendants |
|---------|-----------|------------------------------------------------------------------|
| Pt. No. 29 | 7/27/18 | PVD, PHT |
| Pt. No. 30 | 8/9/18 | Atherosclerosis |
| Pt. No. 9 | 9/18/18 | Atherosclerosis, PHT |
| Pt. No. 31 | 5/7/18 | PVD, PHT |
| Pt. No. 32 | 10/23/18 | Atherosclerosis |
| Pt. No. 33 | 3/19/19 | Atherosclerosis, PHT, DCHF |
| Pt. No. 34 | 8/14/18 | PVD |
| Pt. No. 35 | 9/28/18 | PVD, PHT |
| Pt. No. 36 | 8/7/18 | Atherosclerosis, PHT |

| Pt. No. 37 | 8/17/18 | Atherosclerosis, PHT |
| Pt. No. 38 | 5/11/18 | Atherosclerosis, SCHF |
| Pt. No. 39 | 10/12/18 | Atherosclerosis |
| Pt. No. 40 | 6/20/18 | Atherosclerosis, PHT |
| Pt. No. 41 | 9/20/18 | PVD, PHT |
| Pt. No. 42 | 7/13/18 | Atherosclerosis, SCHF |
| Pt. No. 43 | 8/20/18 | Atherosclerosis, SCHF |
| Pt. No. 44 | 12/6/18 | Atherosclerosis, DCHF |
| Pt. No. 45 | 10/5/18 | Atherosclerosis, SCHF |

93.     Dr. Mansour refused to accept Defendants' payment of $400 per day in which they utilized his office to conduct these ultrasounds, as he believed that the tests were conducted not to improve patient health, but to fabricate diagnoses and increase Defendants' revenues.

## 2.     Mass Office Visits Prior to Annual Capitation Calculation Deadline

94.     Defendants instructed Dr. Mansour and their other affiliated physicians to conduct office visits for hundreds of patients without any clinical indication just prior to the deadline to report diagnoses for capitation calculations. They required the affiliated physicians to conduct these visits in order to ensure that all suggested diagnoses could be captured before capitation payments were recalculated for the following year.

95.     These visits had no other purpose or justification (other than increasing the capitation payments Defendants received from Medicare), and were not medically necessary or reasonable. Defendants agreed to pay Dr. Mansour $100 per patient to conduct these medically unnecessary follow up visits.

96.    For example, from August to December 2017, Defendants required Dr. Mansour to perform approximately 480 completely unnecessary office visits in order to renew or add diagnoses before the capitation deadline.

97.    Dr. Mansour captured new diagnoses when patients actually had new diseases or illnesses; however, he did not report the false suggested diagnoses, and he indicated that a number of diagnoses which were no longer accurate for the patient should be removed from the patients' 5 Star Checklists and should not be reported to Medicare for capitation calculations.

98.    In 2018, Defendants required Dr. Mansour to again engage in the same fraudulent practice, and he conducted approximately 600 completely unnecessary office visits in the five months leading up to the capitation deadline. During this round of patient visits, Dr. Mansour personally observed that the diagnoses that he stated should be removed from the patients' records during the previous year were still in fact present on the corresponding 5 Star Checklists. Dr. Mansour's medical direction was ignored by Defendants.

99.    Before both rounds of office visits conducted just prior to the capitation deadline, Dr. Mansour informed Defendants that he did not need to see many of the patients at issue as he had already met with them in the past couple months. Defendants instructed him that he needed to bring them in for another visit regardless of when he last saw them.

100.    During both rounds of office visits conducted prior to the capitation deadline, Defendants refused to pay Dr. Mansour for visits which did not result in additional diagnoses (and, consequently, increased capitation payments). When Dr. Mansour enquired about why

he was not paid for those visits, Defendants stated that they were "duplicative" and that they "could not make any money off those." Clearly, Defendants intended to illegally incentivize physicians for additional diagnoses and, consequently increased MRA scores and capitation payments.

      **3.**     **Medivan Preventative Screenings**

     101.    In November 2018, Defendants utilized a mobile medical clinic, operated out of a van, to conduct "preventative screenings" in the parking lot outside Dr. Mansour's office. Defendants affirmatively represented and led Dr. Mansour to believe that these screenings were for the purpose of improving patient health and increasing Dr. Mansour's Healthcare Effectiveness Data and Information Set ("HEDIS") score.

     102.    Medicare calculates a physician's HEDIS score based on whether the physician took certain steps and collected certain information to ensure patient health. Medicare then pays each physician based on his or her HEDIS score. Physicians with higher HEDIS scores are paid more in order to incentivize physicians to provide high-quality preventative patient care.

     103.    When Defendants approached Dr. Mansour regarding the Medivan program in the fall of 2018, his HEDIS score was 4.7 out of 5.0. However, Defendants informed Dr. Mansour that he was still "leaving money on the table" and assured him that by conducting preventative screenings, they would be able to close any gaps which were lowering his HEDIS score. As conducting preventative screenings would not harm and could only help his patients, and Defendants were willing to conduct them free of charge, Dr. Mansour agreed to the plan.

104.    Defendants mailed each of Dr. Mansour's Freedom MA plan patients a letter in which they stated that Dr. Mansour recommended that they attend a preventative screening and instructed them to come to the van on certain dates for a preventative screening at Dr. Mansour's request.

105.    During these "preventative screenings," a technician reviewed the patient's medical and family history, which is commonplace for such screenings. Collection of such information could also satisfy requirements for increasing a physicians' HEDIS score. However, the technician also conducted unnecessary vascular tests on asymptomatic patients, which is abnormal and inappropriate for preventative screenings and would have no effect on a physician's HEDIS score.

106.    Defendants did not inform Dr. Mansour that vascular tests would be conducted in addition to standard preventative screenings, and Dr. Mansour did not order or approve the performance of these vascular tests. If Defendants had informed Dr. Mansour that the preventative screenings would include vascular tests, he would have objected to their performance, as such tests were medically unnecessary and not clinically indicated.

107.    As usual, Defendants' representatives reviewed these vascular test results and sent them to Dr. Mansour along with a list of suggested diagnoses purportedly indicated by the test results. These tests were completely unrelated to HEDIS requirements, and therefore were not performed to fill the gaps in Dr. Mansour's HEDIS score as Defendants represented. Additionally, these tests were not clinically indicated by the patient's symptoms, and therefore were not performed to improve patient health. Instead, these tests were

conducted solely to produce additional fraudulent diagnoses and increase Defendants' capitation revenues from Medicare.

108. The vascular tests conducted by Defendants included unnecessary arterial studies, which were not clinically indicated. Arterial studies are performed manually by a technician using a handheld device to measure results. These studies are particularly unreliable, and are therefore not used to diagnose vascular problems, because if the technician applies too much pressure during the study, the results will not be accurate. Defendants also conducted unnecessary echocardiograms, which were not clinically indicated, during preventative screenings.

109. Defendants conducted mobile preventative screenings on approximately 200 of Dr. Mansour's patients. Based on the results of unnecessary tests which were performed during these preventative screenings (and which were unrelated to HEDIS measures or patient health), Defendants again suggested numerous inaccurate diagnoses, such as PVD, DD, DCHF, and PHT, at a much higher frequency than would be expected in a similar patient population.

110. Defendants sent Dr. Mansour the test results in late December of 2018, along with the corresponding suggested diagnoses, and instructed Dr. Mansour to conduct an office visit with each patient, during which he should confirm Defendants' suggested diagnoses. Defendants told Dr. Mansour that he had to bring all 200 patients in for office visits within approximately two weeks (*i.e.*, before the annual capitation calculation deadline). Dr. Mansour explained that he could not possibly add 200 patients to his schedule in only two weeks.

111.    Though Dr. Mansour did not conduct the office visits Defendants requested, Dr. Mansour did review the test results Defendants provided. Dr. Mansour personally observed that Defendants suggested cardiovascular diagnoses for approximately half of the 200 patients based on the unnecessary tests performed during preventative screenings (a much higher frequency than would be expected in a similar patient population), and that many of the diagnoses suggested by Defendants were false.

**F.     Coercion and Pressure to Ensure Affiliated Physician Cooperation**

112.    Defendants' tactics and practices described above were utilized with respect to Dr. Mansour himself, but Dr. Mansour also personally observed that Defendants utilized these same tactics and practices with respect to other affiliated physicians who were treating patients covered by Defendants' MA plan. These physicians felt the same pressure and often succumbed to Defendants' coercive tactics by upcoding and fabricating the diagnoses of their MA plan patients. Upon information and belief, Defendants utilized these same tactics and practices on **all** affiliated physicians who treated patients covered by Defendants' many MA plans.

113.    The tactics and practices described above were promoted and characterized by Defendants as ways to ensure that each patient's actual diseases or illnesses were not inadvertently missed or overlooked by their treating physicians. Defendants marketed these practices as safeguards to ensure patient health and wellbeing, to assist affiliated physicians with properly managing patient care, and to catch dangerous conditions in their early stages.

114.    However, Defendants' stated purposes were entirely false and pretextual. Defendants' actual goal in implementing these practices was to fraudulently increase the

capitation payments they received from the Government by adding false or inaccurate diagnoses to patient medical records, and they were successful in achieving this goal.

115. Dr. Mansour personally observed that affiliated physicians who objected to Defendants' practice of inflating or fabricating diagnoses or who refused to comply were coerced and pressured, then criticized, then, ultimately, terminated from Defendants' MA plan.

116. For example, when Dr. Mansour informed Defendants' representatives that some of their suggested diagnoses were not actually indicated by the patient's medical records, test results, histories, or physical examinations, they first attempted to change his mind, or they asked him to review the records again.

117. When Dr. Mansour still refused to add the suggested diagnoses to patient records, Defendants criticized his performance, and informed him that his failure to participate was resulting in low MRA scores (and, consequently, decreased capitation payments).

118. Dr. Mansour initially succumbed to Defendants' pressure and included incorrect diagnoses in patient medical records at the "suggestion" of Defendants in order to remain an affiliated physician and to keep treating his established MA plan patients. The corresponding false risk adjustment data was submitted or caused to be submitted to Medicare by Defendants and resulted in increased capitations to Defendants to which they were not entitled.

119. However, after two years of working under these conditions, Dr. Mansour refused to comply with Defendants' requests to add false diagnoses to patient records. In

retaliation for his refusal to engage in Defendants' fraudulent scheme, Defendants terminated Dr. Mansour's affiliation agreement in 2019, thereby eliminating his MA plan patients' coverage for his services.

120.    Dr. Mansour personally observed that Defendants utilized the same practice of escalating from suggestions, to requests, to warnings, and finally, to termination in order to pressure and coerce other affiliated physicians to implement Defendants' fraudulent scheme and to include false or exaggerated diagnoses in patient medical records. Upon information and belief, Defendants utilized these same tactics and practices on all 300 affiliated physicians who treated patients covered by any of Defendants' many Medicare Advantage plans.

121.    Dr. Mansour personally observed that other affiliated physicians succumbed to Defendants' coercive tactics and reluctantly fabricated diagnoses in order to ensure that they could continue treating their established MA plan patients and to avoid termination. The only way affiliated physicians could continue to treat their patients covered by Defendants' MA plans was to participate in Defendants' scheme by upcoding and fabricating patient diagnoses. Upon information and belief, Defendants utilized these same coercive tactics to successfully induce not only Dr. Mansour, but also many other affiliated physicians, including but not limited to Dr. Mansour's friends and colleagues, to engage in this fraudulent scheme across Defendants' many MA plans.

## VII. GOVERNMENT REIMBURSEMENT FOR FRAUDULENT CLAIMS

122.    Defendants engaged in the practices and tactics described above since Dr. Mansour first affiliated with PPC in February 2017, but, upon information and belief, Defendants engaged in these practices for a significant amount of time before then, these practices have continued through the present, and these practices were implemented with respect to Defendants' many MA plans.

123.    Dr. Mansour personally observed that Defendants knowingly presented or caused to be presented claims for capitation payments based on the fabricated and inaccurate diagnoses described above to Medicare for payment. Upon information and belief, Defendants also submitted claims for capitation payments based on fabricated and inaccurate diagnoses to Medicare for payment under all of their many MA plans. All such claims for payment constituted false claims under the FCA and were not eligible for reimbursement.

124.    Defendants knowingly received, accepted, and retained reimbursement from Medicare for capitation payments based upon false or inaccurate patient diagnoses. Upon information and belief, Defendants knowingly received, accepted, and retained reimbursement from Medicare for capitation payments based upon false or inaccurate patient diagnoses under their many other MA plans. All such claims resulted in overpayments, in the form of inflated capitation payments, by the Government to Defendants, thereby damaging the federal treasuries.

125.    The claims described above are false and fraudulent because Defendants represented and certified that Medicare requirements, including the requirement that all information contained therein was accurate, had been met, when this was not in fact the case.

Based on Dr. Mansour's personal observations, Defendants knew or should have known that these claims and certifications were false and fraudulent.

126.    Defendants actually knew that these claims were false and fraudulent because Dr. Mansour directly and clearly informed Defendants that the diagnoses they suggested were incorrect  and that they were coercing affiliated physicians to include fabricated and/or exaggerated diagnoses in patient medical records.

127.    Defendants submitted their false claims to Medicare for payment with full knowledge of the falsity of their claims. Moreover, they knew or should have known that submitting and receiving payment for these claims created an overpayment, yet they did not repay their fraudulently obtained funds to Medicare.

128.    Defendants' falsifications and misrepresentations and certifications were material to the Government's decision to reimburse Defendants for these claims. Had the Government known the true nature of these claims, that is, that the diagnoses reported therein were fabricated, inaccurate, and/or of a lower level of complexity than reported and that they resulted from Defendants' fraudulent scheme and false certifications and attestations, the Government would not have reimbursed Defendants for these claims.

129.    Based on Dr. Mansour's personal observations of Defendants' practices, policies, and procedures, upon information and belief, Defendants continue to implement this fraudulent scheme, submit the above described fraudulent claims to the Government for payment, and receive and retain reimbursement from the Government to which they are not entitled, in violation of the FCA.

## VIII.  DEFENDANTS' RETALIATION AGAINST DR. MANSOUR

130.    As discussed above, soon after he entered into the Agreement with PPC in February 2017, Defendants began to coerce Dr. Mansour to fabricate and/or exaggerate the complexity of MA plan patient diagnoses.

131.    Defendants provided Dr. Mansour with 5 Star Checklists to use during patient visits, in which additional diagnoses or revisions to diagnoses to increase complexity were listed, and Defendants strongly encouraged Dr. Mansour to revise his patients' records in accordance with their suggestions. They also coerced Dr. Mansour to ensure that previous diagnoses from past patient visits (which were listed on the 5 Star Checklist) were "renewed" and included in his patients' current records.

132.    Defendants' medical coders audited Dr. Mansour's patient medical records after he completed patient visits, during which they suggested additional diagnoses, revisions to diagnoses to increase complexity, and the renewal of past diagnoses.

133.    Defendants provided Dr. Mansour documents and training regarding the annual capitation payouts for each diagnosis and encouraged Dr. Mansour to "look for" the highest payout diagnoses and ensure that they were "captured." Medical necessity and treatment were not the standard; to the contrary, it was a concentrated and intentional effort to upcode and fabricate diagnoses.

134.    Defendants delivered Dr. Mansour reports stating the cost for each of his higher cost patients, highlighted those patients with lower MRA scores, and urged Dr. Mansour to "check" on whether any diagnoses were "missing" for these particular patients and add diagnoses in order to increase the capitation payments for these patients.

135.    Defendants sent Dr. Mansour patient test results obtained during "joint performance improvement" programs and again listed additional diagnoses that he should include in the patients' medical records during subsequent office visits, purportedly based on these test results.

136.    At first, Dr. Mansour believed that, through the implementation of these various practices, Defendants were merely attempting to ensure that accurate, existing patient diagnoses were not overlooked. Thus, Dr. Mansour simply notified Defendants that their "suggested" diagnoses were not indicated and submitted his patients' medical records with only accurate diagnoses.

137.    Defendants informed Dr. Mansour that he needed to capture all available diagnoses to ensure that Defendants were properly reimbursed. When he did not do as Defendants' instructed, Defendants complained of Dr. Mansour's poor performance and criticized his low MRA scores (and, consequently, decreased capitation payments).

138.    Dr. Mansour initially succumbed to Defendants' pressure and included false or exaggerated diagnoses in patient medical records. However, as the end of 2018 approached, Dr. Mansour began to object to Defendants' practices more frequently by arguing with and refusing to implement changes suggested by Defendants' medical coder. He explicitly and directly notified Defendants that their suggested diagnoses were false, that including them in patient medical records would be fraudulent and illegal, and that he therefore would no longer do so.

139.    Finally, in late December 2018, after Dr. Mansour refused to conduct 200 office visits within the space of two weeks (to confirm the fraudulent, inaccurate, suggested

diagnoses Defendants generated from the Medivan preventative screenings), Defendants stopped communicating with Dr. Mansour.

140.    From January 2019 to late March 2019, Defendants did not engage in their usual practices with respect to Dr. Mansour. They no longer sent representatives to pick up his completed 5 Star Checklists. The medical coder no longer contacted him regarding revisions to his diagnoses. They no longer urged him to attend training sessions or provided lists of his low MRA-score patients. They no longer contacted him regarding joint performance improvement programs. Dr. Mansour hoped that his objections had been heeded, that Defendants' coercion had ended, and that he could finally treat his MA plan patients without Defendants' illegal and relentless pressure to exaggerate and fabricate diagnoses.

141.    However, suddenly and without warning, Defendants terminated Dr. Mansour's Agreement, thereby eliminating his MA plan patients' coverage for his services. On March 28, 2019, PPC sent Dr. Mansour notice that it was terminating his Agreement effective May 31, 2019, and that his services would no longer be covered for patients under Defendants' MA plans after that date.

142.    In its termination letter to Dr. Mansour, PPC stated that the reasons for his termination included his "failure to meet [his] commitment to implement the patient center [sic] medical home care model, refusal to cooperatively participate in joint performance improvement programs, and overall difficulties in establishing a business relationship." The real reason was his refusal to continue to participate in Defendants' Medicare fraud.

143.    Defendants planned to terminate Dr. Mansour's Agreement in or around late December 2018, due to his ongoing refusal to fabricate diagnoses and, finally, his refusal to conduct 200 office visits to confirm inaccurate Medivan diagnoses before the capitation deadline. However, upon information and belief, Defendants delayed his termination until March 28, 2019, only three days before the deadline for his patients to change insurance plans, in order to ensure that his MA plan patients would not have enough time to switch insurance plans so that they could continue being treated by Dr. Mansour. This was yet another means by which Defendants retaliated against Dr. Mansour for refusing to participate in their fraudulent scheme.

144.    Defendants' termination of Dr. Mansour's Agreement with PPC was in retaliation for Dr. Mansour's lawful efforts to prevent Defendants' continued fraud against the Government and was therefore in violation of 31 U.S.C. § 3730(h).

145.    Since May 31, 2019, the effective date of PPC's termination of the Agreement, approximately 600 of Dr. Mansour's patients who were insured under Defendants' MA plan, many of whom he had treated since 1997, could no longer receive treatment from Dr. Mansour due to Defendants' withdrawal of coverage for his services.

146.    Many of these patients called Dr. Mansour or visited him in person following Defendants' termination. They were confused regarding why they could no longer be treated by Dr. Mansour, angry and upset that they had to find a new primary care physician, and distressed by the sudden and unexpected interruption to their treatment schedule and plan of care.

147.    These patients trusted Dr. Mansour with their health for many years, and Dr. Mansour had personally developed and implemented their unique, individualized plans of care. Through their retaliatory termination of Dr. Mansour's Agreement, Defendants prevented Dr. Mansour from treating the patients with whom he had developed close and long-standing relationships, and also caused Dr. Mansour severe financial damage by eliminating these patients (who represented approximately one-third of his patient pool and approximately 60% of his practice income) from his practice.

## IX.    CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)

148.    Paragraphs 1-147 are incorporated by reference as if fully set forth herein.

149.    In violation of 31 U.S.C. § 3729(a)(1)(A), Defendants knowingly presented, or caused to be presented, materially false and fraudulent claims, including but not limited to claims based on false certifications, for payment or approval, and specifically requested payments from federal health care programs and/or other federal governmental entities for these claims, including but not limited to claims and requests for capitation payments based on fabricated and/or inaccurate patient diagnoses and risk assessment data, as described in detail above.

150.    As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(A), Plaintiff suffered damages and therefore is entitled, pursuant to 31 U.S.C. § 3729(a)(1), to treble damages as determined at trial, plus a civil penalty of $5,500 to $22,363 for each violation.

## COUNT TWO
## VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)

151.    Paragraphs 1-147 are incorporated by reference as if fully set forth herein.

152.    In violation of 31 U.S.C. § 3729(a)(1)(B), Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, including but not limited to by submitting billings and other records containing false certifications and/or fabricated and/or inaccurate patient diagnoses and risk assessment data based on these fabricated and/or inaccurate patient diagnoses, as described in detail above.

153.    As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(B), Plaintiff suffered damages and therefore is entitled, pursuant to 31 U.S.C. § 3729(a)(1), to treble damages as determined at trial, plus a civil penalty of $5,500 to $22,363 for each violation.

## COUNT THREE
## VIOLATION OF 31 U.S.C. § 3729(a)(1)(G)

154.    Paragraphs 1-147 are incorporated by reference as if fully set forth herein.

155.    In violation of 31 U.S.C. § 3729(a)(1)(G), Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, and knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government. Defendants knew their past, present, and future billings were improper and/or based on false certifications, and they improperly and intentionally retained overpayments despite such knowledge. They did so by, without limitation, submitting claims to Medicare for capitation payments based on fabricated and/or inaccurate patient diagnoses and risk assessment data, by falsely certifying the accuracy of their diagnoses submitted to Medicare,

and by retaining the overpayments from the Government which resulted from these fraudulent practices, as described in detail above.

156.     As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(G), Plaintiff suffered damages and therefore is entitled, pursuant to 31 U.S.C. § 3729(a)(1), to treble damages as determined at trial, plus a civil penalty of $5,500 to $22,363 for each violation.

## COUNT FOUR
## VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)

157.     Paragraphs 1-147 are incorporated by reference as if fully set forth herein.

158.     In violation of 31 U.S.C. § 3729(a)(1)(C), Defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G) through implementation of the coercive and threatening practices described herein to create false records and submit false claims.

159.     As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(C), Plaintiff suffered damages and therefore is entitled, pursuant to 31 U.S.C. § 3729(a)(1), to treble damages as determined at trial, plus a civil penalty of $5,500 to $22,363 for each violation.

## COUNT FIVE
## VIOLATION OF 31 U.S.C. § 3730(h)

160.     Paragraphs 1-147 are incorporated by reference as if fully set forth herein.

161.     In violation of 31 U.S.C. § 3730(h), Defendants terminated their affiliation with Dr. Mansour, and thereby discriminated against him, in retaliation for his lawful efforts to stop Defendants' continued violation of the FCA, as described above.

162.  As a result of Defendants' violation of 31 U.S.C. § 3729(h), Dr. Mansour suffered damages and therefore is entitled, pursuant to 31 U.S.C. § 3730(h)(2), to reinstatement of his affiliation with Defendants' MA plan, all compensatory and special damages, including but not limited to damages for emotional distress and lost profits, sustained as a result of Defendants' discrimination and retaliatory termination, including litigation costs and reasonable attorneys' fees incurred with respect to this action, all applicable interest, and all other relief afforded therein.

## COUNT SIX
## PAYMENT BY MISTAKE

163.  Paragraphs 1-147 are incorporated by reference as if fully set forth herein.

164.  The false claims that Defendants submitted to Plaintiff's agents, which are described in detail above, were paid based upon mistaken or erroneous understandings of material facts including, but not limited to, the mistaken fact that the risk assessment data, MRA scores,  and patient diagnoses contained in the patient medical records that Defendants submitted to the Government in support of payment were true and accurate.

165.  Plaintiff, acting in reasonable reliance on the truthfulness of Defendants' claims and the certifications and representations made therein, paid Defendants certain sums of money, specifically, MA plan capitation payments, to which Defendants were not legally entitled.

166.  Defendants must therefore account for and pay such amounts, as determined at trial, to Plaintiff.

## COUNT SEVEN
## UNJUST ENRICHMENT

167.    Paragraphs 1-147 are incorporated by reference as if fully set forth herein.

168.    By directly or indirectly obtaining federal funds to which Defendants were not legally entitled, as described in detail above, Defendants received a benefit, which would be unjust and inequitable for Defendants to retain.

169.    Defendants have therefore been unjustly enriched and must account for and pay such amounts, or the proceeds therefrom, as determined at trial, to Plaintiff.

## X.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff-Relator Dr. Mansour prays, on behalf of Plaintiff, that this Court:

1.    For Plaintiff's Causes of Action under 31 U.S.C. § 3729, *et seq.*, enter judgment against Defendants for the amount of Plaintiff's damages, trebled pursuant to 31 U.S.C. § 3729(a), and civil penalties in the amount of $22,363, for each violation of the FCA;

2.    For Plaintiff's Causes of Action for payment by mistake and unjust enrichment, enter judgment against Defendants in the amount of Plaintiff's damages and/or the amount by which Defendants were unjustly enriched or which Defendants retained illegally;

3.    Require that Defendants provide an accounting of all revenues illegally obtained or retained by Defendants;

4.    Award Relator the maximum amount permitted pursuant to 31 U.S.C. § 3730(d);

5.    Order Defendants to reinstate Relator's affiliation with Defendants' MA plan governed by the Agreement, which was illegally terminated in retaliation against Relator in violation of 31 U.S.C. § 3730(h);

6.    Award Relator the maximum amount of compensatory damages, special damages, interest, and all other forms of damages permitted as relief for Defendants' retaliatory termination of the Agreement under 31 U.S.C. § 3730(h);

7.      Award Relator all costs, including court costs, expert fees, investigative expenses, and reasonable attorneys' fees incurred by Relator in the prosecution of this suit pursuant to both 31 U.S.C. § 3730(g) and 31 U.S.C. § 3730(h);

8.      Grant Relator and the United States leave to amend the Complaint based on any new evidence acquired throughout the discovery process, including but not limited to evidence that Defendants submitted the same or similar fraudulent claims to Medicaid, Tricare, or other federal healthcare programs or Medicare Advantage programs, that additional parties engaged in Defendants' fraudulent scheme, or as otherwise permitted under the Federal Rules of Civil Procedure; and

9.      Grant Relator and the United States such other and further relief that the Court deems appropriate and proper.

Respectfully submitted,

**WELDON & ROTHMAN, PL**

By: s/ Bradley P. Rothman
Bradley P. Rothman, Florida Bar No. 0677345
2548 Northbrooke Plaza Drive
Naples, Florida 34119
Telephone: (239) 262-2141
Facsimile: (239) 262-2342
Email: brothman@weldonrothman.com

**-and-**

**MILLER & MARTIN PLLC**

Richard C. Rose, Tennessee Bar No. 017544
Lynzi J. Archibald, Tennessee Bar No. 030063
832 Georgia Avenue, Suite 1200
Chattanooga, Tennessee 37402-2289

Telephone: (423) 756-6600
Facsimile: (423) 785-8480
Email: Richard.Rose@millermartin.com
Email: Lynzi.Archibald@millermartin.com

***Counsel for Plaintiff-Relator Dr. Mansour***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing was served via certified U.S. mail in a properly addressed envelope, postage prepaid, to assure delivery to:

The Honorable William P. Barr, Esq.
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

The Honorable Maria Chapa Lopez, Esq.
U. S. Attorney, Middle District of Florida
400 North Tampa Street, Suite 3200
Tampa, Florida 33602

Randy Harwell, Esq.
Assistant U.S. Attorney, Chief, Civil Division
U.S. Attorney's Office, Middle District of Florida
400 North Tampa Street, Suite 3200
Tampa, FL 33602

This 31st day of August 2020.

**WELDON & ROTHMAN, PL**

By: s/ Bradley P. Rothman
Bradley P. Rothman, Florida Bar No. 0677345